Carrie M. Francis (020453)
Stefan M. Palys (024752)
**STINSON LEONARD STREET LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email: carrie.francis@stinson.com
       stefan.palys@stinson.com
Attorneys for Gateway Deliveries, LLC

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Gateway Deliveries, LLC,<br><br>            Plaintiff,<br><br>v.<br><br>Mattress Liquidators, Inc., David Dolan, Sarah Thomas, and Mattress Firm, Inc.,<br><br>            Defendants. | No. 2014-CV-02033-JWS<br><br>**PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON THE BASIS OF THE ATTORNEY-CLIENT PRIVILEGE OR THE WORK PRODUCT DOCTRINE**<br><br>(Oral Argument Requested) |

A "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject." *See, e.g., Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). Here, Mattress Liquidators, Inc. voluntarily disclosed a November 4, 2013 letter from its attorney, Gary Rosser, in which he advised Liquidators that he "concluded that the [Independent Contractor Agreement (the "ICA")] is not binding as between Mattress Liquidators and Gateway" because it was supposedly "not one of the contracts that was specifically assigned by Bed Mart [to Liquidators], nor was it specifically assumed by Mattress Liquidators." *See* Ex. 4[1] at ML00010712-10716. Rosser Letter 11/4/13 at 2. Liquidators has since "concede[d] it has waived the attorney-client privilege with respect to Gary Rosser's November 4, 2013 letter . . . ." *See* Ex. 5, Rauchway Letter 9/22/15, at 3. Liquidators, however, has withheld other

---
[1] Exhibits 1-3 are lodged under seal as Doc. 88.

1  documents and communications between it and Mr. Rosser, and its other counsel, on the
2  same subject matter.  Accordingly, Gateway seeks an order compelling Liquidators to
3  produce all documents and communications on the same subject matter – *i.e.*, whether
4  there was an enforceable contract between Liquidators and Gateway.

5  Apart from the above waiver, a subject-matter waiver of the attorney-client
6  privilege also results where a party produces documents in litigation and "the waiver is
7  intentional" (Fed. R. Evid. 502(a)(1)), or where the disclosure was inadvertent but the
8  party did not take reasonable steps to prevent disclosure (Fed. R. Evid. 502(b)(1) and
9  (2)).  Here, Defendants each intentionally produced a large proportion of privileged
10 documents.  Defendants' successor counsel second-guesses whether their predecessor,
11 Gary Rosser, had intentionally produced the documents resulting in a waiver under Fed.
12 R. Evid. 502(a).  He had – the parties specifically talked about the number of otherwise
13 privileged documents Defendants produced on July 7, 2015, and Defendants did not
14 claim that it was a mistake, nor try to claw the documents back.  Either way, however, it
15 does not change the result.  That is because even if the production was inadvertent, the
16 proportion of privileged documents produced establishes that Defendants did not take
17 reasonable steps to prevent disclosure, resulting in a waiver under Fed. R. Evid. 502(b).
18 Thus, separately from the waiver above, Gateway seeks an order compelling Defendants
19 to produce all documents and communications on the same subjects – *i.e.*, the Bed
20 Mart-Liquidators asset purchase agreement, the contract with Gateway, the Liquidators-
21 Mattress Firm, Inc. asset purchase agreement, and potential liability to Gateway.

22 Gateway also seeks an award of its fees incurred in resolving the privilege issues
23 pursuant to Fed. R. Civ. P. 37(a)(5) and 37(c)(1)(C).

24 **MEMORANDUM OF POINTS AND AUTHORITIES**

25 **I.    This motion seeks the production of information central to Gateway's claims.**
26

27 Gateway entered into a contract called the ICA with Bed Mart.  Subsequently,
28 Liquidators acquired Bed Mart's assets.  Gateway and Liquidators continued to perform

2

pursuant to the ICA, and executed an Addendum to it.[2]  Later, Liquidators and Firm entered into an asset purchase agreement (the "APA").  As a condition of closing on the APA, Section 3.5(v) of the Asset Purchase Agreement required Liquidators to provide "evidence that the arrangement" with Gateway "has been terminated by [Liquidators] effective on or before the [c]losing [d]ate" of the Firm-Liquidators transaction. Liquidators complied, and this suit followed.

Gateway has sued Liquidators for breaching its contractual duty of good faith and fair dealing, which required it to use its best efforts to include the Contract in the APA.  Gateway has sued Firm for tortiously interfering with the Contract.  Defendants both initially denied that there was a valid contract between Gateway and Liquidators. *Compare, e.g.,* Complaint (Dkt. 1) at ¶ 32 *with* Answer (Dkt. 11) at ¶ 32.

Proof that Defendants knew of the Contract, and its binding effect, is at the core of Gateway's case.  Knowledge of the Contract, or at least of a valid business expectancy, is an element of Gateway's tortious interference claim against Firm. Relatedly, if Liquidators knew prior to the APA that the Contract was binding, then it deceived Firm about that fact when it told Firm that there was no valid contract (Email dated 4/22/14, Ex. 6), which would all-but-prove that Liquidators did not use its best efforts to include the Contract in the APA.  Finally, Liquidators – through David Dolan and Joe Partsch – told Gateway, its advisor in the APA transaction, and Firm that there was no contract with Gateway.  If Liquidators knew that was false, it bears on Messrs. Dolan and Partsch's credibility and malice.  By contrast, if Liquidators can maintain a privilege, it can effectively insulate those witnesses from cross-examination.

To date, Liquidators has produced only evidence favorable to is position.  It has produced a November 4, 2013 opinion letter written by Mr. Rosser in which he opines the ICA did not bind Liquidators because it was supposedly neither assumed by, nor assigned to, Liquidators in the Bed Mart transaction (the "Bed Mart APA").  *See* Ex. 12

---

[2] The ICA and Addendum are hereafter collective the "Contract."

3

1 at ML00007306.

2 Gateway believes this analysis is wrong and the product of a result-oriented 3 reading of the Bed Mart APA. In any event, the face of the letter suggests that 4 Liquidators did not even provide him with the Addendum it had executed with 5 Gateway, which presumably would have altered the conclusion. *Id.*

6 Gateway has reason to believe that Liquidators received advice contrary to Mr. 7 Rosser's several times. First, after the Bed Mart APA, Liquidators had one of its 8 lawyers, Rickey Fitzsimmons, send Gateway a letter entitled "notice of breach of 9 independent contractor agreement" informing Gateway of potential "claims against 10 Gateway . . . for breach of contract . . . arising from acts committed by Gateway 11 contrary to the contract between the parties dated May 1, 2011" – *i.e.,* the ICA. *See* 12 3/23/12, Ex. 7.

13 Second, Gateway believes Liquidators received contrary advice from lawyers 14 from Davis Graham & Stubbs ("DGS"). DGS represented Liquidators in both the Bed 15 Mart APA and the APA with Firm, and now represents both Defendants here. Late in 16 the negotiations with Firm, the same DGS lawyer who had personally handled the Bed 17 Mart APA wrote to Firm, stating that "[a]lthough there is no written agreement with 18 Gateway [and Liquidators], [Liquidators] is concerned about potential liability for an 19 early termination of the perceived term of the BedMart relationship. Accordingly, 20 [Liquidators] would request that as a condition to closing either [Firm] enter into a new 21 contract with Gateway to take effect at closing or assume the terms of the Gateway 22 relationship in its present form." *See* Email dated 4/22/14, Ex. 6.[3] Defendants thereafter 23 negotiated a "side letter" through which Liquidators agreed to indemnify Firm in the 24 event Gateway sued, and Firm agreed to try to negotiate a contract with Gateway. *See* 25 Side Letter, Ex. 8.

26 Liquidators' conduct during the meet-and-confer process has been telling, as

---

[3] Based on the documents produced to date, it is not clear if Liquidators gave DGS the Addendum.

4

well. Liquidators had previously asserted a "mutual mistake" defense, asserting that it did not know until Mr. Rosser's letter that it was not bound by the ICA. It reasoned that this nullified the effect of the Addendum, because that was executed while Liquidators was operating under its mistake. *See* Interrogatory Resp. 1, Ex. 9 (seeking an explanation for Liquidators' denial of a request for an admission "that the Independent Contractor Agreement . . . as modified by the Addendum, was a valid, binding, and enforceable contract between [Liquidators] and Gateway . . . prior to its termination on June 4, 2014."). When confronted with authority that the mutual mistake defense resulted in a waiver of the privilege as to any attorney who advised on the same issue,[4] Liquidators responded that it would withdraw that defense, that "Liquidators does not intend to dispute that it was subject to the Independent Contractor Agreement with Gateway[,]" and consequently "privileged documents related to that issue are not relevant . . . [so] Gateway's waiver argument is moot." *See* Letter dated 10/22/15, Ex. 10, at 2.[5]

Gateway brings this Motion because the contrary advice is still critical, even if Liquidators withdraws that particular defense. While Defendants have stated they will concede the Contract was binding now, they have not taken a position on whether they knew it was binding prior to the execution of their APA. Consequently, Gateway still must prove that issue. And, as above, if Liquidators *did* know it was bound while negotiating the APA, it bears both on whether Liquidators discharged its obligation of good faith and fair dealing and its witnesses' credibility. That is because Liquidators' representatives (Messrs. Dolan and Partsch) told Gateway, Liquidators' own advisor, and Firm, that there was no binding contract. Thus, the information being withheld is critical both to the merits and Gateway's ability to cross-examine Liquidators' witnesses.

---

[4] Gateway Letter dated 10/14/15, Ex. 11, at 3.

[5] Liquidators stated that it "w[ould] soon supplement its discovery responses accordingly." *Id.* at 2. It has not yet done so.

5

### I. Liquidators waived the attorney-client privilege concerning advice it received from any attorney on the existence and enforceability of a contract between it and Gateway.[6]

#### A. The parties agree there has been a waiver of the privilege, but disagree about its scope.

Liquidators voluntarily produced Mr. Rosser's advice several times. First, prior to the litigation, Liquidators produced Mr. Rosser's letter to Firm and Gateway. Second, Liquidators produced Mr. Rosser's letter during this litigation (while represented by Mr. Rosser). Third, after the Court clarified that it had not already found a waiver of any privilege/protection (*see* Order at Dkt. 69), Liquidators (now represented by DGS) produced the letter plus a number of other formerly-privileged documents and communications concerning it. *See* Ex. 12 (collectively the documents and communications involving Mr. Rosser produced on October 2, 2015). Before engaging in that last production, Liquidators stated that it "concede[d] it has waived the attorney-client privilege with respect to Gary Rosser's November 4, 2013 letter to David Dolan." *See* Rauchway Letter, 9/22/15, Ex. 5, at 3.

The parties, however, disagree on the scope of the waiver, in two respects: (1) how to define the subject matter of the waiver; and (2) whether the subject matter waiver extends to counsel other than Mr. Rosser. Liquidators claims the waiver is "limited in scope to the relevant times and subject matter, the limits of which [Liquidators] will better grasp as [it] complete[s its] review of the . . . documents." *Id.*[7] Liquidators' production and privilege log shows that it has treated Mr. Rosser's November 4, 2013 letter, itself, as the subject matter for purposes of the waiver.

---

[6] Liquidators has also claimed the protection of the work product doctrine. The analysis is the same as that for the attorney-client privilege for the grounds set forth in this motion, so Gateway is not separately addressing it. *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010); *Rutgard v. Haynes*, 185 F.R.D. 596, 598 (S.D. Cal. 1999); *Century Aluminum Co. v. AGCS Marine Ins. Co.*, 285 F.R.D. 468, 472 (N.D. Cal. 2012).

[7] The temporal scope of the production is defined in this case by the subject matter of the waiver, so Gateway is not separately addressing it. Based on the subject matter waiver Gateway is arguing for, the temporal scope would be limited to the time between the negotiations of the Bed Mart asset purchase through the Defendants' APA – roughly a three-year period.

6

1  Consequently, it has not produced all communications between it and Mr. Rosser, nor
2  has it produced its communications with any other counsel.  *See,* Liquidators' Privilege
3  Log, Ex. 13, at Entries 12-61 (reflecting other communications with Mr. Rosser, or
4  about his advice), 1-11 (same, regarding Mr. Fitzsimmons), and 62-543 (same,
5  regarding various DGS attorneys).  Similarly, it has not produced communications that
6  appear to relate to the existence or enforceability of the Contract.  *See, e.g., id.* at 2, 10,
7  17, 28, 114-117,  307, and 403.

8  Federal law governs the effect of the production of documents even in cases
9  before the Court on diversity jurisdiction.  *Preferred Care Ps Holding Corp. v.*
10 *Humana*, 258 F.R.D. 684, 690 (S.D. Fla. 2009).  "[T]he burden of proving that the
11 attorney-client privilege applies rests not with the party contesting the privilege, but
12 with the party asserting it."  *Weil*, 647 F.2d at 25.  Liquidators will be unable to defend
13 its restrictive position concerning the scope of its waiver.

14       **1.  The waiver extends to all information on the same subject, rather than all information about the document produced.**
15

16 "An express waiver occurs when a party discloses privileged information to a
17 third party who is not bound by the privilege, or otherwise shows disregard for the
18 privilege by making the information public."  *Grand Canyon Skywalk Dev., LLC v.*
19 *Hualapai Indian Tribe*, 966 F. Supp. 2d 876, 888 (D. Ariz. 2013) (citing *Bittaker v.*
20 *Woodford*, 331 F.3d 715, 719 (9th Cir. 2003)).  "The general rule regarding the
21 voluntary disclosure of privileged attorney-client communications is that the disclosure
22 waives the privilege as to all other communications on the same subject."  *Katz v. AT &*
23 *T Corp.*, 191 F.R.D. 433, 439 (E.D. Pa. 2000); *U.S. v. Plache*, 913 F.2d 1375, 1380 (9th
24 Cir. 1990); *accord* Fed. R. Evid. 502(a) (disclosure in a federal proceeding waives the
25 privilege and the waiver "extends to an undisclosed communication or information . . .
26 if . . . "the disclosed and undisclosed communications or information concern the same
27 subject matter . . . [and] they ought in fairness to be considered together.").
28

7

1    Liquidators narrowly casts the subject matter waiver apparently as being about
2 the November 4th letter itself.  While it is Liquidators' burden to justify this limited
3 scope of its waiver, Gateway is aware of no supporting authority.  To the contrary, each
4 case considers the nature of the advice that has been disclosed, rather than the document
5 in which it was disclosed.  *See, e.g., Weil*, 647 F.2d at 25 (the scope of waiver was "the
6 matter actually disclosed namely, the substance of Blue Sky counsel's advice regarding
7 registration"); *Fox v. City of Tulare*, 2013 WL 5347463, 2 (E.D. Cal. 2013)
8 (determining the scope of the waiver based on "[t]he nature of the legal advice sought");
9 *Blue Lake Forest Prods., Inc. v. U.S.*, 75 Fed. Cl. 779, 794-95 (2007) (finding waiver
10 that resulted from "inserting the Brouha Memorandum into the Administrative Record"
11 was "all documents concerning the same subject matter" which included "the
12 Government's interpretation and implementation of survey and manage requirements"
13 among other topics).

14    Here, the subject of Mr. Rosser's letter and the other produced communications
15 pertain to whether the Contract bound Liquidators/was enforceable, and its potential
16 renegotiation.  *See, e.g.,* Ex. 12 at ML00010705 (Mr. Dolan "wants to renegotiate this
17 contract and if they [Gateway] squawk, he will then slap the overcharge allegation to
18 them and the potential to find another service provider.") and ML00010715 (Mr.
19 Rosser's November 4, 2013 letter, in which he states that "I have concluded that the
20 ICA is not binding as between Mattress Liquidators and Gateway" because "[t]he ICA
21 was not one of the contracts that was specifically assigned by Bed Mart, nor was it
22 specifically assumed by Mattress Liquidators.").

23    That favorable opinion ought, in fairness, to be considered in conjunction with
24 whatever contrary advice Liquidators received, otherwise Gateway is impeded from
25 receiving full discovery on the merits of its claims, and Liquidators' witnesses would be
26 insulated from cross-examination.  *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337,
27 340-41 (9th Cir. 1996) ("The doctrine of waiver of the attorney-client privilege is rooted
28

8

in notions of fundamental fairness. Its principal purpose is to protect against the unfairness that would result from a privilege holder selectively disclosing privileged communications to an adversary, revealing those that support the cause while claiming the shelter of the privilege to avoid disclosing those that are less favorable."). As above, Liquidators appears to have received contrary advice to that it has chosen to disclose, at least from Mr. Fitzsimmons and from DGS. Indeed, if Liquidators is free to withhold other information on that same subject, it could potentially be shielding information about whether, and why, it did not provide Mr. Rosser with the Addendum Liquidators executed when rendering his opinion on whether Liquidators was bound by the ICA the Addendum modified. *U.S. v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998) ("waiver covers any information directly related to that which was actually disclosed."); *U.S. v. Cote*, 456 F.2d 142, 145 (8th Cir. 1972) (disclosure "waived the privilege not only to the transmitted data but also to the details underlying that information[]"). That act suggests that Liquidators was seeking a result-oriented letter to use in the hopes of forcing Gateway to re-negotiate the Contract, and to deceive Firm when negotiating the APA. *See, e.g.,* Ex. 14 (Liquidators told Firm on January 2, 2014 that it "is currently negotiating favorable cost savings in regards to the Arizona delivery service of a minimum amount of approximately $176,000."). Withholding other advice received on the same subject would prevent discovery of that true state of affairs, and give Liquidators' witnesses (Messrs. Partsch and Dolan) carte blanche to stick by their false statements without fear of cross-examination.

### 2. The waiver extends to any attorney who provided advice on the same subject.

Liquidators has taken the position that its waiver does not extend beyond some of its exchanges with Mr. Rosser, and consequently has not produced any other communications with him, and with its other counsel. *See* Liquidators' Privilege Log, Ex. 13, at Entries 1-11 (exchanges with Mr. Fitzsimmons), and 62-543 (same, regarding various DGS attorneys). At a high level, that approach would not make sense.

9

1  Typically, one already knows from the waiver what advice one attorney gave, so the
2  relevant additional information to discover is what contradictory advice the client got
3  from *other* lawyers.

4  And that discovery is what is permitted.  The cases recognize that the "principal
5  purpose" of the waiver analysis is "to protect against the unfairness that would result
6  from a privilege holder selectively disclosing privileged communications to an
7  adversary, revealing those that support the cause while claiming the shelter of the
8  privilege to avoid disclosing those that are less favorable."  *Tennenbaum*, 77 F.3d at
9  340-41.  Consequently, after a waiver, the opponent is entitled to any communications
10 within the subject matter of the waiver with *any* attorney.  *Plache*, 913 F.2d at 1380
11 (party "voluntarily disclosed his privileged attorney communication, thereby waiving
12 the privilege ***on all other communications*** on the same subject." (emphasis added));
13 *Technitrol, Inc. v. Digital Equip. Corp.*, 18 Fed. R. Serv. 2d 561, 2 (N.D. Ill. 1974)
14 ("Nor does the fact that these documents are from different counsel protect the
15 privilege, since the privilege is the client's and involves the particular subject matter. If
16 the rule were limited to only a particular counsel, a party might get several viewpoints
17 and assert reliance on only one, thus barring an inquiry as to the actuality and
18 reasonableness of that reliance."); *In re EchoStar Communs. Corp.,* 448 F.3d 1294,
19 1299 (Fed. Cir. 2006) ("[W]hen EchoStar chose to rely on the advice of in-house
20 counsel, it waived the attorney-client privilege with regard to any attorney-client
21 communications relating to the same subject matter, including communications with
22 counsel other than in-house counsel").

23     **B.**    **Liquidators waived its privilege by putting the advice it received at issue.**
24
25 Again, Defendants have stated their intent to concede that the Contract was
26 binding, and to modify their discovery responses accordingly.  Gateway agrees that this
27 argument will be moot if they do so, but because they have not done so yet, Gateway
28 raises this argument to preserve the issue.

10

State law governs the analysis of an "at issue" waiver in a diversity case. *City of Glendale v. Nat'l Un. Fire Ins. Co.*, 2013 WL 1797308, 4 (D. Ariz. 2013). When a party affirmatively places privileged communications at issue, it waives the attorney-client privilege. *Accomazzo v. Kemp*, 319 P.3d 231, 234, ¶ 9 (Ariz. App. 2014) (citing *State Farm Mut. Auto Ins. Co. v. Lee,* 13 P.3d 1169, 1175, ¶ 16 (Ariz. 2000)). Here, as explained above, Liquidators has used Mr. Rosser's advice as the point at which it learned it was supposedly not previously bound by the ICA, thus triggering its mutual mistake defense. As such, Liquidators put at issue any advice it received on whether the ICA was transferred to it through the Bed Mart APA, and more generally any advice on whether it had a binding contract with Gateway. *State Farm Mutual Automobile Insurance Co. v. Lee*, 13 P.3d at 1173, ¶¶ 10-11 and *id.* at 1179, ¶ 28; *accord, e.g,, Monsanto Co. v. E.I. du Pont de Nemours & Co.*, 2011 WL 1883025, 1 (E.D. Mo. 2011) (assertion of mutual mistake defense put counsel's advice at issue).[8] The scope of the waiver is the same as that analyzed in the preceding section – "[o]nce a party places attorney-client communications at issue, that party waives the privilege with regard to all communications on the same subject matter." *In re G-I Holdings, Inc.*, 218 F.R.D. 428, 432 (D.N.J. 2003).

**II.    Defendants waived any privilege by intentionally, or at least recklessly, producing numerous privileged documents.**

Under Rule 502(a), the attorney-client privilege and work product protection are waived by the production of documents if: "(1) the waiver is intentional; (2) the disclosed and undisclosed communications concern the same subject matter; and (3) they ought in fairness to be considered together." Similarly, "Rule 502(b) specifies that production of a privileged document does not constitute a waiver of the privilege if the production was 'inadvertent,' the privilege holder 'took reasonable steps to prevent disclosure,' and the privilege holder complied with Rule 26(b)(5)(B)." *Lawrence v.*

---

[8] *Accord Galt Capital, LLP v. Seykota*, 2004 WL 298400, 2 (D.V.I. 2004); *Commodity Futures Trading v. Richards*, 1996 WL 308286, 5 (N.D. Ill. 1996).

1 *Dependable Med. Transp. Servs., L.L.C.*, 2014 WL 2510268, 2 (D. Ariz. 2014). Under
2 Rule 502(b), "[t]he burden is on the party claiming a communication is privileged to
3 demonstrate it 'took reasonable steps to prevent' any inadvertent disclosure, tried to
4 remedy such disclosure immediately, and that the opposing party will not be unduly
5 prejudiced by a protective order." *Ceglia v. Zuckerberg*, 2012 WL 1392965, 8
6 (W.D.N.Y. 2012) *aff'd*, 2012 WL 3527935 (W.D.N.Y. 2012).

7 Under either Rule 502(a) or (b), Defendants have waived any protection
8 applicable to communications about the ICA, Addendum, or APA, and the analysis of
9 any potential liability to Gateway. Liquidators' initial production was entirely
10 comprised of 60 emails and their attachments (with many of these being duplicates), for
11 a total of 389 documents, with three emails being withheld as privileged on its log.
12 Based on Defendants' later privilege assertion, of those 60 previously-produced emails,
13 10 (or 16.6%) were subject to the attorney-client privilege. *See* Order Granting Joint
14 Motion to Seal Exhibits (Dkt. 77). Firm's initial production was comprised entirely of
15 89 emails and their attachments (with many of these being duplicates), for a total of 314
16 documents, with one email being withheld as privileged on its log. Of those 89 emails,
17 Defendants have now claimed that 16 (or 17.9%) subject to a claim of attorney-client
18 privilege. *Id.* Those documents were intentionally, not accidentally, produced.

19 Gateway and Defendants conferred about this production repeatedly. Gateway
20 copied Defendants' counsel on an email to accounting firms concerning their objections
21 to a subpoena on the grounds of the attorney-client privilege, the work product doctrine,
22 and the accountant-client privilege. *See* Email, Ex. 3 (attaching various emails that
23 could have been subject to such a privilege claim, including an email that is now listed
24 at Entries 227, 231, 234, 240, 248, and 251 on Firm's privilege log).[9] Three days later,
25 Gateway questioned Defendants on how Firm could claim a privilege as to a single
26 email between Firm's in-house counsel (Kindel Elam) and outside counsel (Melissa

---

[9] The email is attached as Exhibit 3 to Gateway's *Motion to File Under Seal*, filed
28 simultaneously herewith. Firm's log is attached as Ex. 15.

McEllin at Norton Rose Fulbright) in light of the volume of such emails that had already been produced:

> Finally, also on the privilege issue, our prior discussions had largely focused on [Mr. Rosser's] advice to Liquidators. Firm's privilege log identified an email between Kindel Elam and Melissa McEllin dated April 25, 2014. ***Firm, however, produced numerous other emails between Kindel Elam and Melissa McEllin (and others at her firm)***, including one on April 25, 2014 in which Ms. McEllin conveys a draft of the "side letter" that her firm had prepared. In light of the production of these various other communications, Firm cannot withhold this one additional email. Gateway will need Firm to commit to producing that document during the call tomorrow. (Declaration of Stefan Palys, Ex. 16 at ¶ 5 (and Ex. A thereto)).

In the meet-and-confer call that followed, Gateway and Defendants specifically discussed the production of numerous emails between Defendants and their respective counsel. *See* Declaration of Stefan Palys, Ex. 16, at ¶¶ 3-9. Consequently, the parties

> agreed we're at an impasse relating to Liquidators. As to Firm, I explained that Gateway's claim of waiver is predicated on the number of Norton Rose/Firm communications that have been produced. Firm agreed that it would produce the document previously listed on its privilege log. Gateway agreed that it would not claim that the production of that one additional email . . . itself cause[d] a waiver. (*Id*. at ¶ 9 and Ex. B thereto)

In sum, Defendants were fully aware of the scope of the documents produced, and never once claimed that they had been accidentally produced, nor did they try to claw back the documents until the appearance of their third set of lawyers in this case – months later. *Id.* at ¶ 7. The production was intentional, and waived any privilege as to other documents and communications on the same subject. Those emails have been submitted under seal to the Court. Upon review, the Court will see that they relate to the Contract; the APA; and the side letter through which Defendants addressed potential liability to Gateway arising out of the APA and its treatment of the Contract.

Finally, the amount of privileged documents produced in relation to the whole production is one indicator of the reasonableness of the measures taken to prevent disclosure. *Parra v. Bashas', Inc.*, 2005 WL 6182338, 6 (D. Ariz. 2005), *reversed in*

*part on other grounds*, 536 F.3d 975 (9th Cir. 2008) (noting that the ratio of privileged documents to the total number produced bears on whether production was inadvertent; collecting cases finding privilege not waived where the ratio was 3/1000 (.3%), 22/16,000 (.1%), and 200-300/200,000 (.15%)). The point of the "analysis is clearly intended to ensure that the disclosure was simply inadvertent – not reckless." *Id*. Here, as explained, the ratio for Liquidators and Firm is 16.6% and 17.9%, in productions of only 60 and 89 emails.[10] In a batch of emails so small one could quickly flip through all of them, producing this number of privileged communications amounts to at least recklessness – which is consistent with Defendants approach to the privilege issues, generally.[11] Thus, whether under Fed. R. Evid. 502(a) or (b), the any protection has been waived, and all documents/communications on the same subject matter (the ICA, Addendum, the APA, and the side letter) should also be produced.

**III.   Defendants lost any privilege by failing to timely assert it.**

Finally, Defendants also waived any applicable protection by failing to assert its claim of privilege within the thirty days for production afforded by Fed. R. Civ. P. 34. That Rule requires that a written response to a discovery request be served within 30 days of the service of the request, and a privilege log must be provided if documents are being withheld. Fed. R. Civ. P. 34(b).

In *Burlington Northern & Santa Fe Ry. v. United States Dist. Court*, the Ninth Circuit addressed the same issue of a late-produced privilege log, concluding that while it would not adopt a per se rule that would deem privilege waived if a log was not produced within the 30 days set by Rule 34, it would use the 30-day period "as a default

---

[10] Even if one considers the emails and their attachments as separate documents, the percentages would still be 2.5% for Liquidators and 5.1% for Firm – much higher than what has previously been considered inadvertent. Particularly under the circumstances here, where Defendants were alerted to the disclosure and took no action.

[11] Aside from intentionally producing documents, Firm inconsistently claimed on the one hand that its communications with Rosser about the ICA/Addendum before Liquidators accepted the tender of its defense were privileged (Interrogatory ¶ 2, Ex. 17), then waived that supposed pre-representation privilege by answering an RFA stating it had none (RFA ¶ 2, Ex. 18).

14

1   guideline," and use a multi-factor test to make a case-by-case determination. 408 F.3d
2   1142, 1149-1150 (9th Cir. 2005). The factors are the degree to which the objection or
3   assertion of privilege enables the litigant seeking discovery and the court to evaluate
4   whether each of the withheld documents is privileged; the timeliness of the objection
5   and accompanying information about the withheld documents; the magnitude of the
6   document production; and other particular circumstances of the litigation that make
7   responding to discovery unusually easy or unusually hard. *Id*.

8   Here, Defendants only produced their initial privilege logs after the Court entered
9   an order compelling production. Even then, Defendants requested another extension,
10  and still only produced a minimal production with correspondingly skeletal privilege
11  logs. Yet Defendants then produced thousands more documents – including many
12  documents after the Court's October 2nd deadline to complete production. The result is
13  that, eight months after the Ninth Circuit's 30-day default guideline passed, Liquidators'
14  log has gone from three entries to *90 pages* and Firm's log has gone from a single entry
15  to *133 pages*. *See* Exs. 13 and 15, respectively. Defendants should not be permitted to
16  maintain the attorney-client privilege when their failure to even reveal these documents'
17  existence wholly precluded Gateway from evaluating their privilege claims for months.

18  **IV.    Conclusion and LRCiv. 7.2(j) certification.**

19  For the foregoing reasons, the Court should conclude that Defendants have
20  waived the attorney-client privilege concerning the subject matter of the APA, the
21  existence and validity of a contract between Gateway and Liquidators, and how to
22  address potential liability to Gateway through the APA and side letter thereto. The
23  Court should also award Gateway its fees incurred in resolving this motion pursuant to
24  Fed. R. Civ. P. 37(a)(5)(A) and (c)(1), upon compliance with LRCiv. 54.2. For the
25  Court's convenience, Gateway has submitted a form of order simultaneously herewith.

26  Pursuant to LRCiv. 7.2(j), Gateway certifies that, after personal consultation and
27  despite sincere efforts to do so, counsel have been unable to satisfactorily resolve the
28

1 matter. Based on these efforts, it is clear that the parties have attempted, in good faith, to resolve this discovery dispute, but are unable to do so without this Court's assistance.

RESPECTFULLY SUBMITTED this 5th day of November, 2015.

**STINSON LEONARD STREET LLP**

By:   s/Stefan M. Palys
      Carrie M. Francis
      Stefan M. Palys
      1850 N. Central Avenue, Ste. 2100
      Phoenix, Arizona 85004
      Attorneys for Plaintiff

### CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2015, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the District of Arizona by using the CM/ECF System. Participants in the case who are registered CM/ECF uses will be served by the CM/ECF system:

Ronda R. Fisk
Jonathan W. Rauchway
David C. Holman

*Attorneys for Defendants Mattress Liquidators, Inc., David Dolan, Sarah Thomas and Mattress Firm, Inc.*

Robert S. Reder
*Attorney for Plaintiff*

By:  s/ Debbie Messing

16